UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| KIMORAH PARKER,<br>    Plaintiff, | :<br>:<br>: |
| v. | :   Case No. 3:19-cv-939 (SRU) |
| CORRIGAN RADGOWSKI DOC STAFF,<br>    Defendants. | :<br>:<br>: |

### RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Kimorah Parker is a sentenced inmate housed at Cheshire Correctional Institution. *See* Notice, Doc. No. 27.[1] However, this case regards an incident that occurred on August 17, 2018, when Parker was a pretrial detainee at the Corrigan-Radgowski Correctional Center ("Corrigan"). On June 18, 2019, Parker filed this complaint *pro se* and *in forma pauperis* pursuant to 42 U.S.C. § 1983 seeking damages in connection with an alleged violation of her[2] constitutional rights by seven Connecticut Department of Correction ("DOC") officials: Warden Stephen Faucher, Lieutenant Muzykoski, Correction Officer Yagle, Lieutenant Cronin, Captain Diloretto, Correction Officer Witherspoon, and Correction Officer Miser. *See* Compl., Doc. No. 1. On August 9, 2019, in an initial review order, I held that Parker's Fourteenth Amendment excessive force claims could proceed against Warden Faucher, Lieutenant Muzykoski, Lieutenant Cronin, Captain Diloretto, Correction Officer Witherspoon, and Correction Officer Miser (collectively, the "Defendants"). *See* Initial Review Order, Doc. No. 8, at 4–6, 9. In that

---

[1] Parker is currently serving a three-year sentence for assault in the second degree. *See Inmate Information*, CT State Dep't of Corr., http://www.ctinmateinfo.state.ct.us (last visited Nov. 14, 2020). She is scheduled to be released no later than March 17, 2021. *See id.*

[2] Although confined in a male facility, Parker is a transgender female. *See* Compl., Doc. No. 1, at ¶ 4; Initial Review Order, Doc. No. 8, at 1 n.1.

order, I dismissed Parker's excessive force claim for damages against Officer Yagle because Parker had not sufficiently alleged his personal involvement. *Id.* at 6.

On March 5, 2020, the Defendants made a motion for summary judgment based on Parker's failure to exhaust her administrative remedies. Defs.' Mot. for Summ. J., Doc. No. 20. On March 31, Parker filed an opposition. Pl.'s Opp'n, Doc. No. 24. For the following reasons, the Defendants' motion for summary judgment, doc. no. 20, is **granted**.

## I.   Standard of Review

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986) (plaintiff must present affirmative evidence to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts of record in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (explaining that a court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party").

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249–50. The mere existence of some

alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. Regarding materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. *Id.* at 247–48. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex*, 477 U.S. at 323.

Although the court is required to read a self-represented "party's papers liberally to raise the strongest arguments that they suggest," *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015) (cleaned up), "unsupported allegations do not create a material issue of fact" and do not overcome a properly supported motion for summary judgment. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

**II.     Background**

A.     The Incident

The issue presented by the Defendants' motion for summary judgment regards only Parker's administrative grievance process and whether it was adequate. However, the background allegations in this lawsuit provide important context, so I recount them here.

On August 17, 2018, at approximately 12:00 p.m., Officer Yagle denied Parker a shaving razor. *See* Compl., Doc. No. 1, at ¶ 1. (I will refer to this incident as the "August 17 incident.") Officer Yagle's refusal caused Parker to suffer "an emotional and ment[al] health breakdown." *Id.* at ¶ 2. Parker asked to speak with someone from the mental health unit, covered her cell window, and then sat down in the corner of her cell. *Id.* A short time later, Officer Yagle told Parker that the mental health unit had been called, and Parker removed the window covering. *Id.*

Later, Lieutenant Muzykoski, Officer Witherspoon, and Officer Miser entered Parker's cell and told her that she was being sent to a restrictive housing unit ("RHU"). *Id.* at ¶ 3. Parker stood in the back of the cell and explained to the officers that she was emotionally distraught. *Id.* Lieutenant Muzykoski told Parker that they would "talk about it later" and then instructed Officers Witherspoon and Miser to handcuff Parker. *Id.* at ¶ 4. Parker told the officers that she needed female staff members to handcuff her because she was a transgender inmate, but the officers pushed her against the wall and handcuffed her anyway. *Id.* Lieutenant Muzykoski then deployed chemical mace on Parker and falsely said that Parker was resisting. *Id.* The officers then escorted Parker out of her cell. *Id.* at ¶ 5. Due to her anxiety and depression, Parker was shaking and could not walk, so the officers carried her down the stairs. *Id.*

When they reached the RHU, Parker stood against the wall outside the unit and once again tried to explain her situation to the camera operator, but she only "s[u]nk deeper into [her]

pani[c] attack and fear." *Id.* Officers Witherspoon and Miser then placed Parker in a wheelchair. *Id.* at ¶ 6. Although Parker's feet were still touching the ground, the officers spun the wheelchair, which caused Parker to feel as though she were falling backwards. *Id.* Out of fear for her safety, Parker stood up out of the wheelchair but was otherwise compliant. *Id.* Officer Witherspoon then "slamm[ed]" Parker onto the floor, causing Parker to injure her head, and then placed his knee on Parker's neck, restricting her ability to breathe. *Id.* at ¶ 7. Lieutenant Muzykoski then sprayed mace on Parker a second time. *Id.* Parker said that she was unable to breathe, but the officers told her to stop resisting, even though Parker was compliant. *Id.* at ¶ 8.

The officers escorted Parker to the medical unit where they placed her on suicide watch. *Id.* at ¶ 9. There, Parker informed medical personnel that she was suffering from headaches and neck pain. *Id.* She also spoke with Warden Faucher about the incident. *Id.* Warden Faucher said that he had seen the surveillance footage from the RHU and would look into the incident, but he never conducted any investigation. *Id.*

After she was placed in the RHU, Parker continued to endure headaches and neck pain. *Id.* at ¶ 10. She spoke with Lieutenant Cronin and Captain Diloretto about what had occurred. *Id.* Both officials stated that they would investigate the incident and instructed Parker to write a statement about it, but the officials "found nothing." *Id.*

B.    Grievance Procedure

Administrative Directive 9.6 ("A.D. 9.6") "provide[s] a means for an inmate to seek formal review of an issue relating to any aspect of an inmate's confinement that is subject to the Commissioner's authority." A.D. 9.6(1). Because Parker's complaint concerns correctional staff

5

members' use of excessive force, Parker was obligated to exhaust her administrative remedies according to A.D. 9.6.  *See Riles v. Buchanan*, 656 F. App'x 577, 579–81 (2d Cir. 2016) (affirming district court's dismissal based on inmate's failure to exhaust claim of correctional officer's use of excessive force under A.D. 9.6).

The first step for obtaining an administrative remedy pursuant to A.D. 9.6 requires an inmate to seek informal resolution of the issue.  *See* A.D. 9.6(6)(A).  If an "attempt to resolve the issue verbally with the appropriate staff member" fails, then the inmate must submit an Inmate Request Form (Form CN 9601) that "clearly state[s] the problem and the action requested to remedy the issue."  *Id.*  After an inmate submits a written Inmate Request Form, the DOC shall respond to the inmate within 15 business days.  *Id.*

If an inmate is either unsatisfied with the DOC's response to his or her Inmate Request Form or the DOC fails to respond within 15 business days, that inmate may file a "Level 1" grievance (Form CN 9602).  *See id.* at 9.6(6)(C).  When an inmate submits a Level 1 grievance, the inmate must attach the returned Inmate Request Form, which will include "the appropriate staff member's response."  *Id.*  If the inmate never received a response to his or her Inmate Request Form, the inmate must indicate on his or her Level 1 grievance why the Inmate Request Form is not attached.  *Id.*  An inmate must file a Level 1 grievance "within 30 calendar days of the occurrence or discovery of the cause of the grievance."  *Id.*

If an inmate's Level 1 grievance fails to comply with the above procedural requirements, then the DOC may either (1) reject the grievance or (2) return it without disposition, in which case the inmate will have an opportunity to re-file the grievance "after the inmate has corrected the error."  *Id.* at 9.6(6)(E), (F).  The DOC must respond in writing to an inmate's Level 1 grievance within 30 business days of receiving it.  *See id.* at 9.6(6)(I).

If an inmate's Level 1 grievance is returned with a disposition, an inmate may file a Level 2 appeal within five calendar days after receiving that disposition. *See id.* at 9.6(6)(G), (K). If the DOC failed to respond to the Level 1 grievance in a timely manner—that is, within 30 business days of receiving it—an inmate may file a Level 2 appeal "within 65 days from the date of filing" the Level 1 grievance. *See id.* at 9.6(6)(M). Level 2 appeals by inmates confined in Connecticut correctional facilities are reviewed by the appropriate District Administrator. *See id.* at 9.6(6)(K). The District Administrator is required to respond to an inmate's Level 2 appeal within 30 business days of receipt of the appeal. *See id.*

Level 3 appeals are restricted to challenges to department policy, the integrity of the grievance procedure, or instances in which the District Administrator does not reply to an inmate's Level 2 appeals in a timely manner. *See id.* at 9.6(6)(L).

C.  Parker's Grievance Activity

On September 9, 2018, Parker wrote an Inmate Request Form complaining about Officer Yagle's conduct during the August 17 incident, which had caused Parker "to have a ment[al] breakdown and end up in [the] RHU." Att. B to Defs.' Mot. for Summ. J., Doc. No. 20-3, at 9; Pl.'s Opp'n, Doc. No. 24, at 23. Also in that Inmate Request Form, Parker asserted that Captain Diloretto's investigation had yielded "nothing" and requested that something be done about the discrimination against her. *Id.* On December 6, 2018, Parker filed two more (nearly identical) Inmate Request Forms regarding the August 17 incident. *See* Att. B to Defs.' Mot. for Summ. J., Doc. No. 20-3, at 6–7; Pl.'s Opp'n, Doc. No. 24, at 20–21. In those Inmate Request Forms, Parker explained that on August 17 she was "denied a showering razor" and "had a ment[al] breakdown," which resulted in her "being maced," "slammed to the floor," and having a correctional officer's knee pressed into her neck. *Id.* Parker also requested a Freedom of

Information ("FOI") packet regarding the August 17 incident. *Id.* On December 26, 2018, Parker received a reply from the DOC regarding her FOI request; the reply informed Parker that the DOC found no documents responsive to Parker's request. *See* FOI Reply, Att. B to Defs.' Mot. for Summ. J., Doc. No. 20-3, at 4.[3]

On January 8, 2019, Parker filed another Inmate Request Form regarding the August 17 incident. *See* Att. B to Defs.' Mot. for Summ. J., Doc. No. 20-3, at 8; Pl.'s Opp'n, Doc. No. 24, at 22. In that Inmate Request Form, Parker noted that it was her "second time writing about the" August 17 incident. *Id.* Parker explained that she had not yet received a copy of the statement that she "wrote against" Officer Yagle.[4] *Id.* On January 11, 2019, Parker filed another Inmate Request Form. *See* Att. B to Defs.' Mot. for Summ. J., Doc. No. 20-3, at 3; Pl.'s Opp'n, Doc. No. 24, at 17. In that Inmate Request Form, Parker requested video footage from August 27, 2018 because that video footage would depict Parker giving a statement against Officer Yagle through the cell door to Lieutenant Cronin. *Id.*

On January 21, 2019, Parker filed a Level 1 grievance. *See* Att. B to Defs.' Mot. for Summ. J., Doc. No. 20-3, at 12–13; Pl.'s Opp'n, Doc. No. 24, at 26–27. In that Level 1 grievance, Parker explained that she submitted an Inmate Request Form on December 6, 2018 "in regards to finding out who has the statement I wrote against C/O Yagle." Att. B to Defs.' Mot. for Summ. J., Doc. No. 20-3, at 13. Parker reported that she had not received a copy of that statement, and so she wanted "Captain [D]iloretto to either give me an expla[]nation as to the whereabouts of this statement and or [*sic*] send it to me." *Id.* Parker also requested that Captain

---

[3] It appears that Parker also made an FOI request sometime in September or October 2018. On October 11, 2018, Parker received another reply from the DOC regarding an FOI request "for a written statement against C/O Yagle and any investigation that has been done in regards to it." FOI Reply, Att. B to Defs.' Mot. for Summ. J., Doc. No. 20-3, at 5.

[4] Parker includes a purported copy of that statement in connection with her opposition. *See* Pl.'s Opp'n, Doc. No. 24, at 24–25.

8

Diloretto be investigated "for tampering with the statement and keeping it hidden." *Id.* Confusingly, though, Parker then noted that she was "enclos[ing] the copy of the statement I wrote as well." *Id.*

Parker's Level 1 grievance was returned without disposition on January 31, 2019. *See* Att. C to Defs.' Mot. for Summ. J., Doc. No. 20-4, at 2 (Form CN 9606); Pl.'s Opp'n, Doc. No. 24, at 62. The DOC explained on that form why Parker had not complied with A.D. 9.6(6)(E). For one, Parker had failed to attach the Inmate Request Form that had been returned to her (or to explain its absence). *See id.* Second, the DOC explained that "[e]ach grievable matter shall be submitted on a separate CN 9602, Inmate Administrative Remedy Form." *Id.* Apparently, then, the DOC believed that Parker's Level 1 grievance regarded multiple issues. Finally, the DOC explained that a "grievance and the action requested should be stated simply and coherently." *Id.* The DOC also indicated that Parker could re-submit her grievance, but, when she did, she needed (1) to submit "the original," (2) on an "updated form," (3) and deposit it into the Administrative Remedies box. *Id.*

On March 5, 2019, Parker filed a second Level 1 grievance. *See* Att. B to Defs.' Mot. for Summ. J., Doc. No. 20-3, at 14–15; Pl.'s Opp'n, Doc. No. 24, at 28–29. In that second Level 1 grievance, Parker explained that she had "written Captain Diloretto and Lieutenant Cronin about getting a copy of the statement I wrote against Yagle regarding a razor" but neither had responded. Att. B to Defs.' Mot. for Summ. J., Doc. No. 20-3, at 15. Parker said that she also made an FOI request regarding her statement, but that, too, did not return her statement. *See id.* Parker indicated that she "want[ed] a copy of my statement or a response to where it is." *Id.* Parker concluded: "I've include[d] three unanswered requests." *Id.* (It is not clear to what Parker is referring.) On April 8, 2019, Parker's second Level 1 grievance was rejected because it

9

was not "filed within 30 calendar days of the occurrence of the discovery of the cause of the grievance." *Id.* The rejection noted that "[t]his matter may be appealed to" to the District Administrator. *Id.*

On April 25, 2019, Parker filed a Level 2 appeal of that rejection. Att. B to Defs.' Mot. for Summ. J., Doc. No. 20-3, at 16; Pl.'s Opp'n, Doc. No. 24, at 30. In that appeal, Parker wrote:

> I received the [r]equested FOI Packet on December 26[,] 2018. I already began writ[]ing requests seeking informal resolution. I first submitted the First Grievance 1-6-19, which was well within the 30 day period. Now it seems like all that's happening is staff abuse of the administrative remedies process. I want a copy of the statement I physically handed to LT Cronin or a reason why it[']s not in the FOI Packet.

*Id.*

On May 17, 2019, Parker's Level 2 appeal was rejected. *See id.* The reviewer explained:

> You're filing a Level 2 Grievance Appeal on a Level 1 Grievance that was rejected for time frame. As stated in the disposition provided by Acting Warden Carlos you must file your appeal within 30 Calendar days of the occurrence or discovery in accordance with Administrative Directive 9.6 Inmate Administrative Remedies. Your Level 2 appeal is rejected and is not subject to further appeal. Your remedy does not meet the criteria to be filed, reviewed or answered by the Level 3 Reviewer.

*Id.*

**III.    Discussion**

      A.    <u>Parties' Arguments</u>

The Defendants argue that Parker has not exhausted her administrative remedies. First, the Defendants focus on the timing of Parker's submissions. According to the Defendants, Parker filed four Inmate Request Forms regarding the August 17 incident. *See* Mem. in Supp. Defs.' Mot. for Summ. J., Doc. No. 20-1, at 5. Those four Inmate Request Forms were dated (1)

10

September 9, 2018, (2) December 6, 2018, (3) January 8, 2019,[5] and (4) January 11, 2019. *See id.* The Defendants also note that Parker filed two Level 1 grievances, on January 21, 2019 and March 5, 2019. *See id.* at 6. And on April 25, 2019, Parker filed a Level 2 appeal. *See id.* In the Defendants' view, the timing of the above submissions confirms that Parker's submissions were untimely and thus failed to comply with A.D. 9.6. Second, the Defendants argue that Parker's Level 1 grievances do not regard the subject matter of this lawsuit. More particularly, the Defendants point out that Parker's Level 1 grievances regarded the whereabouts of the statement she wrote about the August 17 incident. *See* Att. B to Defs.' Mot. for Summ. J., Doc. No. 20-3, at 13 (Jan. 21, 2019), 15 (Mar. 5, 2019).

In the Defendants' view, then, "this is a straightforward case." *See* Mem. in Supp. Defs.' Mot. for Summ. J., Doc. No. 20-1, at 6. The grievance process was clearly "available" to Parker, the Defendants note, because she made frequent use of it. *See id.* Still, Parker's grievances submitted in this case "were untimely and were not addressed to the issue(s) in this lawsuit." *Id.* at 6–7. Thus, Parker has failed to exhaust her administrative remedies. *See id.* at 7 (citing *Ortiz v. McBride*, 380 F.3d 649, 653–54 (2d Cir. 2004)).

In contrast, Parker argues that she has exhausted her administrative remedies and that, even if she did not, that was excusable. Parker argues that if you consider the documents she submitted to the DOC that did not receive responses, she has exhausted her administrative remedies. *See* Pl.'s Opp'n, Doc. No. 24, at 9. So far as I can tell, Parker attaches two such relevant filings to her opposition. The first is a purported Level 1 grievance regarding the August 17 incident that is dated January 8, 2019. *See id.* at 14–15. The second is a purported

---

[5] Although the Defendants refer to that Inmate Request Form as being filed on January 8, 2018, *see* Mem. in Supp. Defs.' Mot. for Summ. J., Doc. No. 20-1, at 5, the year is plainly a typo: The relevant Inmate Request Form was filed on January 8, 2019. *See* Att. B to Defs.' Mot. for Summ. J., Doc. No. 20-3, at 8.

Level 1 grievance regarding the August 17 incident that is dated February 6, 2019. *See id.* at 72–73. Neither of those grievances contains a reply from the DOC. Parker also attaches to her opposition numerous Inmate Request Forms, Level 1 grievances, and grievance return forms that regard other incidents involving Parker and have nothing to do with this case. *See id.* at 54–62, 65–71, 74–76.

Although Parker does not explicitly say so, she also seems to argue that she was unaware of DOC's grievance procedure and so any failure to exhaust would be excusable. For instance, Parker claims that she has never been provided with a copy of A.D. 9.6. *See id.* at 10 ("Defendants quote prison directive 9.6 to which is not provided but plaintiff is expected to know."). Instead, Parker claims, she has been provided with a "handbook" that is "vague on the proper procedure if grievances are not acknowledged." *Id.* at 10. In general, Parker argues that the "[g]rievance system as a whole in Connecticut is set up to fail by confusing inmates and running you in circles and until they can say you[']r[e] untimely . . . ." *Id.* In support of that point, Parker includes several grievance forms submitted by and returned to another inmate: Wayne Rogers. *See id.* at 77–105. In addition, Parker submits an affidavit from Rogers in which Rogers claims that "Cheshire CI has made the [g]rievance system unavailable," and that "is an ongoing issue with Connecticut DOC in its [e]ntirety." *Id.* at 108.

B.  Discussion

The Prison Litigation Reform Act of 1996 (the "PLRA") requires prisoners to exhaust available administrative remedies prior to filing a federal lawsuit regarding prison conditions. *See* 42 U.S.C. § 1997e(a).[6] "Failure to exhaust is an affirmative defense under the PLRA" and

---

[6] Section 1997e(a) provides: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

12

so "a defendant bears the burden of proving that an inmate did not exhaust his or her remedies prior to filing the action in court." *Durham v. Hanna*, 2020 WL 4586688, at *3 (D. Conn. Aug. 10, 2020) (cleaned up). Section 1997e(a) applies to all claims regarding prison life, *Porter v. Nussle*, 534 U.S. 516, 532 (2002), and it requires exhaustion of any available administrative remedies, regardless of whether they provide the relief the inmate seeks. *See Booth v. Churner*, 532 U.S. 731, 741 (2001). A claim is not exhausted until the inmate complies with all administrative deadlines and procedures. *See Woodford v. Ngo*, 548 U.S. 81, 90 (2006); *see also Vidro v. Erfe*, 2019 WL 4738896, at *6 (D. Conn. Sept. 26, 2019) (holding that proper exhaustion requires "full compliance with all administrative procedures and deadlines," and so "a prisoner must comply with *all* steps set forth in Directive 9.6, including deadlines and utilization of each step of the administrative appeal process.") (cleaned up). Informal efforts to put prison officials on notice of inmate concerns do not satisfy the exhaustion requirement. *See Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007). If the deadline to file a grievance has passed, an unexhausted claim is barred from federal court. *See Woodford*, 548 U.S. at 95.

      The exhaustion requirement may be excused only when a remedy is not available in practice even if it is "officially on the books." *See Ross v. Blake*, 136 S. Ct. 1850, 1858–59 (2016). This means that "an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Id.* at 1859 (quoting *Booth*, 532 U.S. at 738). The United States Supreme Court has established three kinds of circumstances in which an administrative remedy might be unavailable: (1) "when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates;" (2) when a procedure is "so opaque that it becomes, practically speaking, incapable of use;" or (3)

"when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859–60. "Whether an administrative remedy was available to a prisoner in a particular prison or prison system is ultimately a question of law, even when it contains factual elements." *Hubbs v. Suffolk Cty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015). An inmate must exhaust his administrative remedies before filing an action in federal court. *See Neal v. Goord*, 267 F.3d 116, 122 (2d Cir. 2001), *overruled on other grounds by Porter v. Nussle*, 534 U.S. 516 (2002); *Gulley v. Bujnicki*, 2019 WL 2603536, at *3 (D. Conn. June 25, 2019).

Parker did not satisfy the PLRA's exhaustion requirement because she did not comply with numerous requirements of A.D. 9.6. For instance, Parker's first Level 1 grievance was submitted—whether on January 8, 2019, as Parker claims, or on January 21, 2019, as the Defendants claim—well over 30 calendar days after August 17, 2018. *See Durham*, 2020 WL 4586688, at *6 (holding that inmate failed to exhaust by not filing Level 1 grievance within 30 calendar days from the date of the occurrence). Further, as the DOC indicated in returning Parker's January 21, 2019 Level 1 grievance without disposition, Parker neither attached the returned Inmate Request Form nor explained why it was not attached. *See* Att. C to Defs.' Mot. for Summ. J., Doc. No. 20-4, at 2; *see also Vidro*, 2019 WL 4738896, at *9–10 (holding that inmate failed to exhaust based on time-bar and failure to attach returned Inmate Request Form or to explain why it was not attached).

The two potentially relevant grievances that Parker claims she submitted—those from January 8, 2019 and February 6, 2019—do not change the analysis. First, it is not at all clear that Parker ever filed those grievances. However, because I must view the record evidence in the light most favorable to Parker, I will assume that she did. As I have already described, even if

14

Parker had filed both those grievances, it would not matter for exhaustion purposes because both were filed well over 30 calendar days after August 17, 2018 and so are untimely under A.D. 9.6(6)(c).

To the extent that Parker suggests that I should excuse her failure to exhaust, I disagree. Parker apparently claims that she cannot have been expected to know what A.D. 9.6 said. Parker argues that the "Defendants quote prison directive 9.6 to which is not provided but plaintiff is expected to know." Pl.'s Opp'n, Doc. No. 24, at 10. Instead, Parker says that she was provided with a "handbook" that is "vague on the proper procedure if grievances are not acknowledged." *Id.* Parker attaches a few pages from that "handbook." *See* Handbook, Att. D to Pl.'s Opp'n, Doc. No. 24, at 49–52. Those pages make clear that the "handbook" is no substitute for A.D. 9.6. *See id.* at 50 ("The procedures and standards for the Department's Administrative Remedies Process are fully set out in Administrative Directive 9.6 . . . . You should make yourself familiar with its provisions and refer to it for specific information pertaining to an issue you may have, and how to address it. This summary is intended for information only and, of itself, establishes no procedures or standards.").

Notably, Parker does *not* claim that she was unaware of the proper grievance procedure; she merely says that A.D. 9.6 was "not provided" to her and that she was unreasonably "expected to know" its provisions. Pl.'s Opp'n, Doc. No. 24, at 10. In fact—again, looking at the record in the light most favorable to Parker—it seems clear that Parker understood A.D. 9.6's grievance procedure. For instance, Parker attaches to her opposition numerous (unrelated) Inmate Request Forms and Level 1 grievances that Parker filed well before the August 17 incident. Similarly, in her Level 2 appeal on April 25, 2019, Parker displayed her knowledge of the grievance procedure when she wrote: "I already began writ[]ing requests seeking informal

15

resolution" and "I first submitted the First Grievance 1-6-19, which was well within the 30 day period." Att. B to Defs.' Mot. for Summ. J., Doc. No. 20-3, at 16. In addition, Parker attempts to make a general argument about the DOC's grievance procedure. *See* Pl.'s Opp'n, Doc. No. 24, at 10 ("The [g]rievance system as a whole in Connecticut is set up to fail by confusing inmates and running you in circles . . . ."); Aff. of W. Rogers, Att. 7 to Pl.'s Opp'n, Doc. No. 24, at 108–09.[7] Thus, it appears that Parker is aware of the DOC's grievance procedure. *Cf. Nickelson v. Annucci*, 2018 WL 7269856, at *8 (N.D.N.Y. Nov. 21, 2018) (holding that inmate was not unaware of the prison's grievance procedure because, in part, he has filed previous grievances and appealed them).

Even if Parker were unaware of the DOC's grievance procedure, that would not alter my decision. Numerous district courts in the Second Circuit have held that mere unawareness of a prison system's administrative grievance process cannot excuse an inmate's failure to exhaust. *See, e.g.*, *Vidro*, 2019 WL 4738896, at *8 ("[A] plaintiff must show more than mere unawareness of an existing grievance procedure; he must show that he was unaware because, for example, prison officials threatened him for use of the grievance system or affirmatively misrepresented the process."); *Caldwell v. C.O. Kusminsky*, 2020 WL 6162524, at *5 (N.D.N.Y. Apr. 1, 2020) ("It is well settled that, post-*Ross* [in 2016], a plaintiff must show more than mere unawareness of an existing grievance procedure."); *Galberth v. Washington*, 2017 WL 3278921, at *11 (S.D.N.Y. July 31, 2017) ("A plaintiff post-*Ross* must show more than mere unawareness of an existing grievance procedure.'); *cf. Morgan v. City of Henderson Detention Ctr.*, 2012 WL 2884889, at *6 (D. Nev. July 13, 2012) (noting that "all courts considering [whether inmates are excused from the exhaustion requirement for mere unawareness] have held that inmates'

---

[7] The numerous grievances filed by Rogers that Parker attaches to her opposition—several of which pre-date Parker's grievances in this action—are not relevant to this case. *See* Pl.'s Opp'n, Doc. No. 24, at 77–105.

16

awareness of a prison's grievance system is irrelevant" and citing cases from the Sixth, Seventh, Eighth, and Tenth Circuit Courts of Appeals).  In any event, I need not decide whether mere unawareness can excuse an inmate's failure to exhaust because I hold that Parker was not unaware of the DOC's grievance process for the reasons articulated above.

In sum, the record evidence raises no inference that A.D. 9.6 operated as a "dead end" or provided a procedure "so opaque" that it was "incapable of use," and no evidence suggests that any prison administrators "thwart[ed]" Parker's ability to take advantage of her administrative remedies through "machination, misrepresentation, or intimidation."  *Ross*, 136 S. Ct. at 1859–1860.  The record evidence merely reflects that Parker failed to satisfy A.D. 9.6's requirements.  Thus, the Defendants have satisfied their burden of demonstrating that Parker failed to exhaust her administrative remedies, and so I grant the Defendant's motion for summary judgment.

### IV.   Conclusion

For the reasons articulated above, I **grant** the Defendants' motion for summary judgment, doc. no. 20, based on Parker's failure to exhaust her administrative remedies, as required by the PLRA.  The Clerk is instructed to enter judgment for the Defendants and to close this case.

SO ORDERED at Bridgeport, Connecticut this 24th day of November 2020.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge